

*Ilana Haramati*
*Partner*
Direct (646) 860-3130
Fax (212) 655-3535
ih@msf-law.com

September 12, 2023

**VIA ECF**

Honorable Tonianne J. Bongiovanni
United States Magistrate Judge
District of New Jersey
402 E. State Street
Courtroom 6E
Trenton, NJ 08608

  Re: *United States v. Eliyahu Weinstein*, 23-mj-03038 (TJB)

Dear Magistrate Judge Bongiovanni,

  We represent defendant Eliyahu Weinstein in the above-referenced case. We write to respectfully move for Mr. Weinstein's pretrial release pursuant to the conditions proposed that reasonably assure the safety of the community and his continued appearance in this case. *See* 18 U.S.C. § 3142(c). Because Mr. Weinstein has already been detained for nearly two months, we respectfully request expeditious consideration of Mr. Weinstein's bail application.

**I. Introduction and Legal Standard**

  The Bail Reform Act of 1984 requires pretrial release on a personal recognizance bond "unless the [Court] determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community." 18 U.S.C. § 3142(b). In making this determination, the Court should consider the following factors: "(1) the nature and circumstances of the offense charged . . .; (2) the weight of the evidence against the person; (3) the history and characteristics of the person . . . (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release." *Id.* at § 3142(g).

  Even if the Court finds that release on the defendant's personal recognizance creates a risk of flight, obstruction or a danger to the community, the law still favors pretrial release "subject to the least restrictive further condition, or combination of conditions, that [the Court] determines will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(c)(1)(B); *accord United States v. Patel*, No. CR 20-MJ-14001 (ZNQ), 2020 WL 1698785, at *2 (D.N.J. Apr. 8, 2020) ("the Bail Reform Act of 1984 . . . favors pretrial release"). Thus, "[w]henever a court can fashion the conditions of an applicant's release in such a manner that the danger may be averted, it must do so and grant the motion for release. . . ***the Court must only deny bail as a matter of last resort***." *United States v. Hunter*, No. 19-CR-620 (JAD), 2020 WL 2537579, at *2 (D.N.J. May 19, 2020) (emphasis added).

To detain Mr. Weinstein, the government must demonstrate by clear and convincing evidence that he poses either a danger to the safety of the community or a serious risk of obstruction of justice, or by a preponderance of the evidence that he "is likely to flee," and that there are no "conditions or a combination of conditions" to ameliorate those risks. 18 U.S.C. § 3142(c)(1), (f). The government cannot do so here.

Mr. Weinstein is charged with investor fraud based on alleged transactions occurring between 2021 and 2023. As the criminal complaint outlines, he faced similar fraud charges a decade ago. *See* Crim. Compl. ¶5. The present charges and Mr. Weinstein's past convictions are uniformly financial in nature. Per the Third Circuit, even a risk of repeat fraud offenses cannot warrant detention based on a risk of future dangerousness: the Bail Reform Act, only "authoriz[es] detention only upon proof of . . . a danger of recidivism in one or more of the crimes actually specified by the bail statute," in § 3142(f) as "support[ing] a motion for detention." *United States v. Himler*, 797 F.2d 156, 160 (3d Cir. 1986). Section 3142(f) enumerates particular categories of charged crimes permitting detention based on dangerousness—they include largely violent crimes, sex crimes, drug crimes, and weapons crimes—none of which are alleged as to Mr. Weinstein. Fraud charges like those in the criminal complaint, however, are notably absent from the statutory list. Neither Mr. Weinstein's charges themselves, nor Mr. Weinstein's criminal history can warrant his detention for dangerousness.

Nor does Mr. Weinstein present a significant risk of flight or non-appearance. On July 19, 2023, when Mr. Weinstein learned that federal agents sought his arrest while he was away from home, he voluntarily self-surrendered. He made no effort to flee or otherwise evade law enforcement. And, of course he didn't flee, he has nowhere else to go, and without a passport he also has no means of flight. Mr. Weinstein has lived his entire life locally. His wife and six of his children live in New Jersey, his seventh child lives only so far as Brooklyn. His parents, siblings, adult children, baby grandchildren, nieces and nephews also all live here. While, like many Jews, he has traveled to Israel for family vacation, any connection he has to Israel is ephemeral. He has no roots there, or close family; he does not have an Israeli passport, the ability to work in Israel, or a place to live. All of Eli Weinstein's family, friends, and connections are here. He has nothing and no one anywhere else in the world. There is simply no credible argument that Mr. Weinstein poses an unmitigated flight risk.

In any event, the proposed bail package is tailored to address any lingering doubt regarding any risk that Mr. Weinstein's release may pose. The conditions are some of the most restrictive in the federal system: home detention, electronic monitoring, limitation to a single cellular telephone monitored by Pretrial Services, which will make it virtually impossible for Mr. Weinstein to violate his bail undetected. And perhaps most importantly, twenty members of Mr. Weinstein's closest family and friends, including his siblings and his adult children, have volunteered to co-sign his $10 million bond, and post seven family properties. The sheer number of Mr. Weinstein's closest relations whose lives could be forever upended by a $10 million bail judgment, supplies powerful moral suasion. This overwhelming package is surely sufficient to reasonably assure his appearance in Court and the safety of the community.

The law is clear: "it is only a limited group of offenders who should be denied bail pending trial." *United States v. Madoff*, 586 F. Supp. 2d 240, 247 (S.D.N.Y. 2009) (quotation marks and citations omitted) (granting bail to defendant accused of largest Ponzi scheme in history who posed a significant risk of obstruction); *accord United States v. Salerno*, 481 U.S. 739 (1987) ("The Bail Reform Act carefully limits the circumstances under which detention may be sought to the most serious of crimes."). Mr. Weinstein is not one of them. This Court should order his pretrial release on the proposed substantial bail conditions presented here.

**II.     The Court Should Release Mr. Weinstein On the Proposed Bail Conditions**

   **A.     *The Proposed Conditions***

We respectfully submit that the following conditions are sufficient to reasonably assure Mr. Weinstein's appearance, the safety of the community, and the integrity of the judicial process during this case:[1]

(1)  A $10 million bond secured by seven properties, six of which are the family homes of Mr. Weinstein's close family, including: (i) his brother and his brother's eight minor children, (ii) Mr. Weinstein's niece (his sister's daughter) and her three young children, (iii) Mr. Weinstein's second niece (his brother's daughter) and her new baby, and (iv) three homes owned by three of Mr. Weinstein's in-laws who have close relationships to Mr. Weinstein, each of whom has numerous minor children living at home; and (v) the seventh property is an investment property of a close family friend, whose family relies on the income from the property.

(2)  The $10 million bond would also be co-signed by additional sureties, a total of 19 financially responsible individuals, all of whom are close family and friends, and most of whom work as educators, with special needs children, and with community service organizations. The proposed co-signers include: (i) Mr. Weinstein's two grown children and their spouses, each of whom has new babies at home and are just starting their lives as financially independent adults; (ii) three of Mr. Weinstein's siblings, one of whom is posting property (the other two siblings do not own property), and all of whom have several minor children living at home; (iii) a longtime community rabbi who supports several children; and (iv) six of Mr. Weinstein's in-laws who have close relationships with Mr. Weinstein and his family.[2]

---

[1] Notably, this package far exceeds the bail conditions ordered in Mr. Weinstein's prior case, which was secured by only five homes, and did not include some of the most restrictive electronics and monitoring conditions proposed here.

[2] While we understand that Pretrial Services will vet Mr. Weinstein's proposed sureties prior to his release, in the interest of efficiency, we respectfully request that the Court order Mr.

(3) Home detention enforced by GPS monitoring, at Mr. Weinstein's family home in New Jersey, where his wife and children live; only travel outside the house would be for pre-approved employment, and pre-arranged medical and legal visits, as authorized by Pretrial Services.

(4) Installation of a doorbell camera at Mr. Weinstein's residence, to which Pretrial Services will have live access to monitor the identity of visitors at Mr. Weinstein's home.

(5) Electronic devices limited to a single cellular telephone monitored by Pretrial Services; all other people living in the home will maintain their electronic devices as password protected, and would attest that they will not share the passwords with Mr. Weinstein.

(6) Agreement not to secure new travel documents.

(7) Waiver of extradition from Israel.

(8) Strict Pretrial Services supervision.

(9) Mr. Weinstein will not directly or indirectly associate or have contact, outside the presence of his counsel, with his co-defendants, or other co-conspirators as identified by the government; however, this prohibition would not limit his defense attorneys and their investigators from conducting an appropriate defense investigation.

## B. *The Proposed Conditions Are Sufficient to Reasonably Assure the Court*

The proposed bail package is tailored to address precisely any concerns the Court may have regarding dangerousness, as well as obstruction or risk of flight. Mr. Weinstein will be on home detention with electronic monitoring; he will also install a doorbell camera that will give Pretrial Services transparency into who Mr. Weinstein meets with at home. This combination of restricted movement and strict electronic oversight by Pretrial Services will curtail Mr. Weinstein's ability to meet with potential alleged co-conspirators to coordinate actions similar to the allegations in the criminal complaint. That will reasonably assuage any risk of recidivism or obstruction.

He will also be permitted only a single monitored cellular telephone, without access to other internet-enabled electronic devices or other communication devices. Mr. Weinstein will thus be effectively precluded from speaking to co-defendants or others remotely without detection, or otherwise attempting to raise funds from investors via the internet or electronic communication. This combination of stringent supervisory conditions will severely restrict his ability to meet with

---

Weinstein's release on the conditions proposed, provided that all the conditions are satisfied, and Pretrial vets and approves the sureties prior to Mr. Weinstein's release.

or speak to individuals undetected to coordinate additional activities like the charged crimes—any attempts to do so would be immediately detected by Pretrial Services. Courts have accepted similar conditions to ameliorate concerns of recidivism, obstruction and coordination among alleged co-conspirators. *See, e.g., United States v. Campos*, No. 19-CR-575 (FB), 2019 WL 7049953, at *1-2 (E.D.N.Y. Dec. 23, 2019) (the defendant, an alleged organized crime figure, was charged with "racketeering, tax fraud, tax evasion, money laundering, making false statements to government agents, extortionate credit collection, wire fraud and obstruction of justice," he had a prior record of federal fraud offenses; the court found that the following conditions were "sufficient to reasonably mitigate th[e] risk" of similar conduct: (1) "home detention," (2) "electronic monitoring of his cellular telephone and other internet-enabled devices by Pretrial Services," (3) prohibiting his "access [to] any cellular telephones or other internet-enabled devices belonging to his wife and children. All such devices shall be protected by passwords to which the defendant does not have access," and (4) he was required to "give the government and Pretrial Services access to the real-time feed and recordings of the video security system at his home.").

Even if the Court finds Mr. Weinstein's release poses some risk, the stringent conditions proposed are more than sufficient to reasonably assure the Court. *See, e.g., United States v. Esposito*, 309 F. Supp. 3d 24, 31 (S.D.N.Y. 2018) (ordering defendant's pretrial release subject to strict conditions as the "danger Esposito poses to the community can be reasonably mitigated by conditions of release," although finding that "there is sufficient evidence that Esposito has significant involvement and influence in violent activities"); *United States v. Dreier*, 596 F. Supp. 2d 831, 833-35 (S.D.N.Y. 2009) (releasing defendant on substantial conditions, including home confinement, and a $10 million personal recognizance bond, despite finding "that [the defendant], if released without conditions, would pose a genuine risk. . . ."); *see also United States v. Madoff*, 586 F. Supp. 2d 240, 247 (S.D.N.Y. 2009) ("The [Bail Reform] Act does not require that the risk be zero, but that conditions imposed 'reasonably assure' appearance.").

The significant moral suasion that Mr. Weinstein's sureties, who have agreed to post seven properties, serves as another powerful disincentive to violating his bail conditions, attempting to flee, or committing crimes while on release. The financial stability of not just Mr. Weinstein's own minor children, but those of many of his nearest and dearest family and friends will be at stake—he would not cavalierly jeopardize the futures of so many relations. Three of Mr. Weinstein's siblings and their spouses have agreed to act as sureties. His sister and one of his brothers both work in education to support themselves and their large families (each has more than five minor children at home). Mr. Weinstein's other brother, another proposed surety, works in a community non-profit organization; his wife (Mr. Weinstein's sister-in-law) works as an administrator at a local school. They have eight children at home. This brother has offered to post his own home, and additional properties in which Mr. Weinstein's brother's own daughter lives with her husband and baby, as well as another property where Mr. Weinstein's other niece (his sister's daughter) lives with her husband and three children. Collectively three homes where Mr. Weinstein's close family live will serve as security.

Two of Mr. Weinstein's grown children, and their spouses are also proposed sureties. Mr. Weinstein's young adult son and daughter-in-law have a 10 month old baby at home. They both

work in education, Mr. Weinstein's son is a tutor at a local educational institution, and his daughter-in-law works with special needs children. Mr. Weinstein's young adult daughter and son-in-law, another set of proposed sureties, also have a young baby at home. The additional proposed sureties, are a community rabbi with a longstanding relationship with Mr. Weinstein, who himself supports three minor children on a modest but consistent rabbinical salary, and six additional in-laws who each have numerous children they support, and work in local businesses, including in education, healthcare, and catering.

The significant risk that a $10 million bond places on the 19 proposed sureties and their families, all of whom have close relationships with Mr. Weinstein, will exert significant moral suasion on Mr. Weinstein. Mr. Weinstein simply would not risk triggering a $10 million judgment, which would hobble the financial fortunes of so many close family and friends, cripple the futures of his children who are just starting out in life, and undermine the family stability of his baby grandchildren. The extraordinary number of sureties, who have so much to lose, serves a further reasonable assurance of the safety of the community, and of Mr. Weinstein's compliance with the terms of his release. *See, e.g., United States v. Yijia Zhang*, No. CRIM.A. 12-498, 2014 WL 5285928, at *4 (E.D. Pa. Oct. 16, 2014) (addressing that "moral suasion" requires "a substantial relationship with the defendant."); *United States v. Batista*, 163 F. Supp. 2d 222 (S.D.N.Y.2001) (listing factors to evaluate a potential surety's capacity for "moral suasion" as including "the strength of the tie between the suret[y] and defendant (i.e. family or close friend, close or estranged)").

**III.** **Mr. Weinstein's Criminal History Does Not Support a Finding that He Poses an Unmitigated Risk of Dangerousness**

    **A.** *Legal Standard: Only Those Crimes Specifically Enumerated in § 3142(f) of the Bail Reform Act Permit Detention Based on Dangerousness*

Under the Bail Reform Act, a defendant may be detained for dangerousness if, by "clear and convincing evidence "no condition or combination of conditions will reasonably assure the safety of any other person and the community." 18 U.S.C. § 3142(f). The risk of future dangerousness that may warrant detention, is limited to the set of crimes specifically delineated by the statute:

(A) a crime of violence, a violation of section 1591 [sex trafficking], or an offense listed in section 2332b(g)(5)(B) [terrorism] for which a maximum term of imprisonment of 10 years or more is prescribed;

(B) an offense for which the maximum sentence is life imprisonment or death;

(C) an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), or chapter 705 of title 46 [maritime drug laws];

> (D) any felony if such person has been convicted of two or more offenses described in subparagraphs (A) through (C) of this paragraph, or two or more State or local offenses that would have been offenses described in subparagraphs (A) through (C) of this paragraph if a circumstance giving rise to Federal jurisdiction had existed, or a combination of such offenses; or
>
> (E) any felony that is not otherwise a crime of violence that involves a minor victim or that involves the possession or use of a firearm or destructive device (as those terms are defined in section 921), or any other dangerous weapon, or involves a failure to register [as a sex offender] under section 2250 of title 18, United States Code; or

18 U.S.C. § 3142(f)(1). Essentially, the only crimes permitting detention for dangerousness are violent crimes, sex crimes, narcotics crimes, and weapons crimes.

The statute does not permit detention based on dangerousness for other criminal allegations. Third Circuit case law expressly limits detention for dangerousness to the statutorily enumerated offenses—even for repeat offenders. In *United States v. Himler*, the Third Circuit squarely addressed "whether the statute authorizes ***pretrial detention upon proof of danger to the community other than from those offenses which will support a motion for detention***," as listed in § 3142(f)(1), and held "that ***it does not***." *United States v. Himler*, 797 F.2d 156, 160 (3d Cir. 1986) (emphasis added). The Third Circuit added: "If Congress had intended to authorize pretrial detention in all cases where recidivism appears likely it could easily have done so," but it did not. *Id.*

Instead, the Bail Reform Act, "authoriz[es] detention only upon proof of . . . ***a danger of recidivism in one or more of the crimes actually specified by the bail statute***." *Id.* (emphasis added); *accord United States v. Akinola*, No. 11- CR-310 (JLL), 2016 WL 4508230, at *4 (D.N.J. Aug. 29, 2016) ("the Court agrees with Defendant that only the crimes identified in Section 3142 of the Act would support a finding by the Court that the Defendant poses a danger to the community."). A recidivism risk for a crime not specifically identified in the statute cannot support detention for dangerousness, even in a case involving allegations of recidivism. !

### B. *Mr. Weinstein's Criminal History Does Not Support a Finding of Dangerousness Under the Bail Reform Act*

On July 19, 2019, Mr. Weinstein was arrested on a criminal complaint alleging investor fraud. *See* Crim. Compl., Attach. A. The criminal complaint addresses several allegedly fraudulent deals, charging that Mr. Weinstein "orchestrat[ed]" a "substantial scheme to defraud investors," which operated in "a Ponzi-like fashion." *See* Crim. Compl. ¶¶ 3, 19. Although the criminal complaint spans over 20 pages, and details numerous specific factual allegations regarding Mr. Weinstein, it contains not a whiff of violence, narcotics, weapons, or other similar crimes. Instead, the entirety of the charges are rooted in fraud. And, while the federal fraud statutes are serious, they are not enumerated in § 3142(f). They thus cannot serve as the basis for

a finding of dangerousness warranting detention.

For the same reason, Mr. Weinstein's criminal history, also involving fraud charges, and any attendant risk of recidivism, likewise cannot support detention. In 2010, Mr. Weinstein was charged with crimes related to investment fraud, to which he pled guilty in 2013. *See United States v. Weinstein*, No. 11-CR-701 (D.N.J.). He was subsequently charged with a separate investment fraud in 2013, to which he pled guilty in 2014. *See United States v. Weinstein*, No. 14-CR-219 (D.N.J.). Like the present criminal complaint, Mr. Weinstein's prior charges solely involved fraud offenses. While Mr. Weinstein's criminal history may suggest a risk of recidivism for fraud, such crimes are notably absent from the list of offenses in § 3142(f) permitting detention for dangerousness. Under established Third Circuit case law, serial fraud allegations cannot constitute a risk of future dangerousness as contemplated under the Bail Reform Act, and thus cannot support detention.

Mr. Weinstein's case is closely analogous to *Himler*: the Third Circuit's unequivocal holding that the *Himler* defendant's real risk of fraud recidivism could not support detention for dangerousness is equally applicable here. Specifically, in *Himler*, the Third Circuit vacated the district court's detention order, which was based on "the danger of the defendant's recidivism in crimes involving the use of fraudulent identification." *Himler*, 797 F.2d at 158. The *Himler* defendant had a history of prior frauds, including credit card fraud, and several instances of possessing forged identity documents. He also faced additional federal fraud charges. *Id*. Looking at the facts, the Third Circuit confirmed that: "[t]he record before us supports a finding that there is a danger that the defendant will, if released, commit another offense of the type for which he has been previously convicted and with which he is presently charged, namely crimes involving the use of false identification." *Id.* at 159. Nonetheless, the Third Circuit reversed the district court's detention order. Because the defendant's fraud charges—both his prior charges and those pending before the court in *Himler*—were not the types of charges identified in the Bail Reform Act, even a real risk of recidivism could not support detention based on a finding of dangerousness. Per the Third Circuit, the Bail Reform Act "does not authorize the detention of [a] defendant based on danger to the community from the likelihood that he will if released commit another offense involving [fraud]." *Id.* at 160.[3]

*Himler* is squarely on point. The only allegations Mr. Weinstein has ever faced, in this case and in the past, have uniformly sounded in fraud. Both of Mr. Weinstein's prior cases in this district, as well as the instant criminal complaint stem from allegations of investor fraud. *See* Crim. Compl. ¶¶ 1-5; *United States v. Weinstein*, No. 14-CR-219 (D.N.J.); *United States v. Weinstein*, No. 11-CR-701 (D.N.J.). Whatever risk of recidivism his record suggests, *Himler* resoundingly precludes detention for dangerousness on that basis. *Himler*, 797 F.2d at 160 (bail statute "authoriz[es] detention only upon proof of . . . a danger of recidivism in one or more of the crimes actually specified by the bail statute."); *accord United States v. Day*, No. 17-CR-00031,

---

[3] Although Mr. Weinstein's criminal history cannot support detention, any risk of recidivism "may be considered . . . in setting conditions of release." *Himler*, 797 F.2d at 159. The proposed package is tailored to reasonably address any such concerns that the Court may have.

2017 WL 5457983, at *4 n.34 (D.N.J. Nov. 13, 2017) (citing *Himler* as "authorizing detention upon proof of a likelihood of flight, a threatened obstruction of justice or a danger of recidivism in **one or more of the crimes actually specified by the bail statute**") (emphasis added).[4]

## IV. The Complaint's Obstruction Charge Does Not Support Detention

Mr. Weinstein similarly cannot be detained based on allegations of obstruction of justice under the Bail Reform Act. The statute only permits detention based on a finding that there are no combination of conditions which can reasonably assure against future obstruction of justice, "in a case, that involves . . . a **serious risk** that such person will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror." 18 U.S.C. § 3142(f)(2)(B). Nothing remotely similar is alleged here. Instead, the criminal complaint does little more than repackage the fraud allegations as obstruction of justice. The government effectively charges that by undertaking the allegedly fraudulent actions described in the criminal complaint, Mr. Weinstein violated the terms of his prior supervised release, and restitution orders. That, according to the government, transforms fraud allegations into obstruction of justice in violation of 18 U.S.C. § 1503. *See* Crim. Compl. ¶¶ 53-70. The criminal complaint's bootstrapping is not the "serious risk" of obstruction contemplated by the Bail Reform Act.[5]

The facts alleged also fall far short of the obstructive conduct contemplated by § 1503. They simply do not fit the legal requirements of obstruction under the statute charges. The weakness of the government's obstruction evidence further thus warrants Mr. Weinstein's release. *See, e.g., United States v. Tyson*, No. 60187-066, 2008 WL 45745, at *5 (E.D. Pa. Jan. 2, 2008) (concluding "at this time the weight of the government's evidence is weak," based on the defendant's successful legal arguments disputing the evidence supporting the charges); *see also United States v. Brown*, No. CRIM. 87-00296-04, 1987 WL 28095, at *2 (E.D. Pa. Dec. 14, 1987) ("In order to detain defendant pursuant to 18 U.S.C. § 3142(f)(2)(B), the government must prove

---

[4] For the same reason, the 2013 revocation of Mr. Weinstein's bail under 18 U.S.C. § 3148 in his prior case cannot serve as a basis for detention based on dangerousness now. The § 3148 standard is entirely different from § 3142 applicable here. Under § 3148, a court may revoke bail if the defendant committed **any crime** while released on bail. *See* 18 U.S.C. § 3148(b)(1) (a court may revoke a defendant's bail and order detention based on "probable cause to believe that the [defendant] has committed a Federal, State, or local crime while on release"). That stands in stark contrast to § 3142, which only permits detention for dangerousness based on a narrow list of specific alleged crimes of violence and narcotics offenses. *See* 18 U.S.C. § 3142 3142(f)(1).

[5] Specifically, the § 1503 charge is not the type of obstruction risk primarily concerning the Bail Reform Act. Whereas the Bail Reform Act's obstruction prong focuses on the risk of threats to potential witnesses and other individuals involved in the judicial process, the § 1503 charge against Mr. Weinstein is different in kind. It effectively alleges his failure to follow through on his earlier sentence—it is a repackaged allegation that Mr. Weinstein's release poses a risk of recidivism for fraud charges, which cannot support Mr. Weinstein's detention. *See supra* § III.

by clear and convincing evidence that defendant will obstruct or attempt to obstruct justice . . .") (quotation marks omitted).

Section 1503 criminalizes "corrupt[] . . . endeavors to influence, intimidate, or impede" a pending judicial proceeding. *See United States v. Cohen*, 301 F.3d 152, 157 (3d Cir. 2002) (vacating obstruction conviction for failing to prove the elements of a § 1503 offense, including "that a judicial proceeding was pending") (quotation marks, citations and modifications omitted). Allegations of violations of supervised release, such as those charged against Mr. Weinstein, are not encompassed by the obstruction statute. The Third Circuit has stated clearly that "probation supervised by court-appointed officers," analogous to supervised release, "does not constitute a pending proceeding," a prerequisite for a § 1503 charge. *United States v. Davis*, 183 F.3d 231, 239 (3d Cir. 1999).

*United States v. Lewis*, is instructive in this regard. *See United States v. Lewis*, 438 F. App'x 145 (3d Cir. 2011). In *Lewis*, the defendant violated his term of supervised release by, among other things, "committing a federal, state, or local crime," which his conditions of supervised release expressly prohibited. *See id.* at 147. The U.S. Probation Department filed a petition seeking revocation of his supervised release ("VOSR petition"). Following the defendant's arrest on the VOSR petition, he threatened a U.S. Probation officer involved in the VOSR proceedings. Based on that threat, probation filed an amended VOSR petition (not a separate charge in a new indictment) alleging that the defendant had violated 18 U.S.C. § 1503 by threatening a probation officer once a VOSR proceeding had been instituted. *Id.* at 148.

The § 1503 violation in *Lewis* contrasts with the allegations against Mr. Weinstein in two important ways. First, in *Lewis* the alleged § 1503 violation occurred only once a VOSR proceeding was pending—there was no suggestion that a supervised release violation alone could constitute obstruction of justice, as the government has charged here. Second, even the obstructive threats interfering with the VOSR proceeding in *Lewis* were not charged as a new stand-alone crime of obstruction of justice. They were instead charged within the confines of the VOSR proceeding. *Lewis* thus highlights the infirmities of charging a VOSR as a separate obstruction of justice count against Mr. Weinstein.

The Bail Reform Act instructs the Court to consider the "weight of the evidence" among the other factors in determining bail. *See* 18 U.S.C. § 3142(g)(2). The novelty of the government's § 1503 obstruction theory suggests that the "weight" of obstruction evidence is slight at best. It cannot support a finding by clear and convincing evidence that Mr. Weinstein poses "a serious risk" of obstruction, as required for detention. 18 U.S.C. § 3142(f)(2)(B).

**V.     Mr. Weinstein Does Not Pose a Risk of Flight**

The government also cannot justify Mr. Weinstein's continued detention based on a risk of flight. He is a lifelong resident of New York and New Jersey. His family is here. He has nothing and no one anywhere else in the world. Indeed, he self-surrendered at the time he was charged, providing strong indication that flight is not a consideration. And, any minute risk Mr. Weinstein may pose is easily remediated by the strong bail package proposed.

Mr. Weinstein's conduct since the start of this case has undermined any suggestion that he may pose a risk of flight. He self-surrendered on the very same day he learned that federal agents sought his arrest. On the morning of July 19, 2023, agents appeared at Mr. Weinstein's home in Lakewood, New Jersey to arrest him in this instant case. Coincidentally, he was not there that morning. Although understanding that he could face a prison sentence, a protracted legal battle, and potentially detention in the interim, Mr. Weinstein expeditiously turned himself into authorities. He never threatened, attempted, or even considered flight. And that is no surprise. Throughout his prior cases, Mr. Weinstein has never failed to appear for court as directed, or otherwise sought to flee. And that is no surprise, everything and everyone Mr. Weinstein knows is local.

Eliyahu Weinstein was born in Brooklyn, the son of Orthodox Jewish parents. His mother, Basya, worked hard as a school principal and educator, to support her family. And Eli's father, Eliezer, has proudly been a mainstay of his local Jewish learning institution all his life. His parents still live in Brooklyn in Mr. Weinstein's childhood home. All of Mr. Weinstein's siblings have similarly remained here. They live with their families in New York City and its suburbs, Staten Island, and New Jersey. Several siblings work in education, as principals, educators, and mentors for students in their local communities. His extended family members, including many grown nieces, nephews, and cousins are likewise local residents of New Jersey and New York.

Mr. Weinstein similarly settled close by in Lakewood, New Jersey. He is the father of seven children, ages 11 to 27. Five of Mr. Weinstein's children still live at home with him and his wife. His two oldest children, ages 26 and 27 (both of whom are proposed sureties), have settled in Brooklyn and New Jersey, and started families of their own. It is no exaggeration to say that all of Mr. Weinstein's family members are within a 100-mile radius of where Mr. Weinstein grew up. He has never strayed far; he has nowhere to go now. *See, e.g., United States v. Talbert*, No. 20-266, 2020 WL 6048788, at *4 (W.D. Pa. Oct. 13, 2020) ("There is no question that Mr. Talbert presented evidence that he is not a flight risk based on [h]is local family ties"); *United States v. Schenberger*, 498 F. Supp. 2d 738, 742 (D.N.J. 2007) ("Factors courts typically look at to assess a defendant's risk of flight include . . . the defendant's family ties, . . . the length of defendant's residence in the community, . . . and any flight or failures to appear in court proceedings. Other factors to examine are . . . efforts to avoid arrest and hidden assets.") (citations omitted).

Because Mr. Weinstein's entire life is in New Jersey and its environs, and he has only U.S. citizenship, there is also no serious argument that Mr. Weinstein poses a flight risk because of the State of Israel's "right of return" for members of the Jewish religion. Mr. Weinstein does not have Israeli citizenship. And his passport was seized by agents on the day of his arrest. Moreover, Israel, a close ally, has a strict extradition treaty with the United States, providing assistance to extradite defendants charged in U.S. Courts. *See Protocol Amending the Convention between the UNITED STATES OF AMERICA and ISRAEL of December 10, 1962* (2005).[6] And, American

---

[6] Available at: https://www.state.gov/wp-content/uploads/2019/02/07-110-Israel-Extradition.pdf.

citizens with no Israeli citizenship, like Mr. Weinstein, cannot claim safe harbor from U.S. prosecution in Israel. *Id.*

Thus, courts have routinely granted bail to defendants who are members of the Jewish religion—even individuals with far more substantial assets and means to travel than Mr. Weinstein—without qualms or concerns regarding flight. *See, e.g., United States v. Motovich*, No. 21-cr-497, Bail Hrg. Tr., ECF Doc. 17 at 48-49 (E.D.N.Y. Sept. 9, 2021) (releasing the defendant, and rejecting the government's argument that the defendant who had a history of prior travel to Israel posed a risk of flight to Israel as a member of the Jewish religion, where the defendant did not have dual citizenship with Israel, and he led a "very Brooklyn-centric life with family, friends, and work, and religious community," he had "an interest in continuing to stay where his family and friends and community members work and his rabbis live"); *United States v. Huberfeld*, No. 16-cr-467 (LJL), ECF Doc. 5 (S.D.N.Y. June 8, 2016), releasing defendant, a hedge fund manager, who was a member of the Jewish community with a history of prior travel to Israel, worth over $100 million, who was charged in public corruption case, on a $1 million bond, with $500,000 of security and two co-signers).[7]

In any event, as part of his proposed bail package, Mr. Weinstein offers to execute a waiver of extradition from Israel, as contemplated by the United States' extradition treaty with Israel. *See Protocol Amending the Convention between the UNITED STATES OF AMERICA and ISRAEL of December 10, 1962*, Art. 9 ("If the person sought consents to be surrendered to the Requesting Party, the Requested Party may surrender the person as expeditiously as possible without further proceedings."). Federal courts have accepted this condition as providing additional security against any flight risk a defendant may pose. *See, e.g., United States v. Motovich*, No. 21-cr-497, Bail Hrg. Tr., ECF Doc. 17 at 48-49 (E.D.N.Y. Sept. 9, 2021); *United States v. Lluberes*, No. 20-cr-493 (VSB), ECF Doc. 28 (S.D.N.Y. Oct. 20, 2020) (extradition waiver form the Dominican Republic, where the defendant held citizenship, ordered as part of his conditions of release).

Mr. Weinstein's prior convictions similarly do not render him a risk of flight. *See Himler*, 797 F.2d at 161 ("the defendant stands accused of an unlawful deceit, there is, of course, no per se presumption of flight where the crime charged involves [fraud] . . . . The defendant's past convictions do indicate a propensity over a period of time to engage in similar unlawful deceits. The purpose of a Section 3142(e) risk of flight determination, however, is not to detain habitual criminals or deceitful persons; it is to secure the appearance of the accused at trial."). Throughout Mr. Weinstein's approximately three year period of pretrial release in his prior cases, he appeared in court as directed, and never made any effort to flee. To the contrary, Mr. Weinstein's goal was, and is, to remain home with his family while he fights the charges pending against him. *See id.* at 161-62 ("the record indicates that the defendant when previously accused of similar crimes and

---

[7] Notably, the government consented to release of Mr. Weinstein's co-defendant, Shlomo Erez, who is an Israeli national, on far less restrictive conditions, undermining any argument that Mr. Weinstein poses an unmitigated flight risk.

not detained always appeared in court as required . . . . The defendant's prior record of appearing in court as required when released prior to trial is a factor in favor of his release now").

The Court should, therefore, order Eliyahu Weinstein's pretrial release pursuant to the comprehensive bail package proposed, which provides reasonable assurance that he will pose neither a risk of flight, obstruction, nor a danger to the community. *See* 18 U.S.C. § 3142(c) (the "judicial officer *shall* order the pretrial release of the person -- . . . (B) subject to the *least restrictive* further condition, or combination of conditions, that such judicial officer determines will reasonably assure . . . the safety of any other person and the community…") (emphasis added).

                        Respectfully submitted,

                            /s/ IH

                        Henry E. Mazurek
                        Ilana Haramati

                        *Counsel for Defendant Eliyahu Weinstein*

cc:      Counsel of Record (*via ECF*)