

U.S. Department of Justice

*United States Attorney*
*District of New Jersey*

---

*970 Broad Street, 7th floor*     973-645-2700
*Newark, New Jersey 07102*

September 17, 2023

<u>Via ECF</u>
Honorable Tonianne J. Bongiovanni, U.S.M.J.
Clarkson S. Fisher Building & U.S. Courthouse
402 East State Street
Trenton, NJ 08608

      Re:   <u>United States v. Eliyahu Weinstein</u>, 23 MJ 3038

Dear Judge Bongiovanni:

      The United States respectfully submits this letter brief in opposition to Defendant Eliyahu Weinstein's ("Weinstein" or the "Defendant") request for release pending trial. The Defendant's conduct in the instant case is the continuation of a pattern of lies, deception, and obstruction that has spanned nearly two decades. The fraud schemes he has masterminded have not only cost scores of victims more than $250 million dollars, but throughout it all he has proven time and again that he is undeterred by any form of supervision.

      The facts demonstrate, far beyond the requisite preponderance of the evidence standard, that the Defendant is a serious flight risk. The Government agrees with Pretrial Services' conclusion that there are no conditions or combination of conditions that will reasonably satisfy the requirements of the Bail Reform Act.

   **I.**   **Factual Background**

      **A. Previous Fraud Convictions**

      On January 3, 2013, the Defendant pled guilty to conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, and engaging in monetary transactions from specified unlawful activity, in violation of 18 U.S.C. § 1957. *See* Crim. No. 11-701 ("Weinstein I"). The charges stemmed from a multi-year real estate fraud scheme that the Defendant orchestrated and used to misappropriate investor funds, resulting in losses of more than $224 million to victims.

      While on pretrial release in Weinstein I, the Defendant committed a second investment fraud scheme involving false and fraudulent representations related to

purported investments in securities and real estate. *See* Crim. No. 14-219 ("Weinstein II"). On July 1, 2013, U.S. District Judge Joel A. Pisano ordered the Defendant to be detained, making particular findings that Weinstein was both a flight risk and a danger to the community. Weinstein I, ECF No. 90.

On February 25, 2014, Judge Pisano sentenced the Defendant to 22 years' imprisonment for Weinstein I, followed by three years of supervised release. At the Defendant's sentencing hearing, Judge Pisano made specific findings that, not only had the Defendant perpetrated a new crime while on pretrial release, he had also engaged in multiple frauds upon the Court in connection with the criminal proceedings: "It's not only your lawyers that you lied to, it's not only me that you lied to and all those phony certifications, the phony affidavits that you have signed, you lied to your wife, you betrayed your children . . . ." *United States v. Weinstein*, No. 14-3122, Joint Appx. Vol. 2 Doc. 003112108414, at 260 (3d Cir. Oct. 21, 2015) ("Weinstein Appeal Joint Appx."); Tr. 700:03; 703:10-18. Finding that the Defendant had lied to the Court about his financial situation in seeking court-appointed counsel, Judge Pisano also ordered that the Defendant repay the Court for the cost of counsel (approximately $19,000). *Id*. at 263; Tr. 703:10-18. In addition, Judge Pisano pointed out that, in the plea agreement, the Defendant represented that he would make a full accounting of where his money had gone, but never did so. *Id*. at 252; Tr. 692:15-23 ("[Y]ou have not accounted for five cents, not five cents of this money has been accounted for, notwithstanding the representations in your plea agreement that you would do that. . . .You haven't accounted for five cents, much less cooperated, much less done anything to help the people you stole from.").

At sentencing, the Court made specific findings that Weinstein was a flight risk, going so far as to request the Bureau of Prisons so designate him:

> I'm going to make a recommendation to the Bureau of Prisons that Mr. Weinstein be considered a flight risk. . . . Mr. Weinstein, to me, remains a flight risk. First of all, he has demonstrated his manipulative nature. Secondly, I am convinced that he has access to money and funds. He has not accounted for any of the proceeds of this fraud and it's been something like $200 million. He has a co-conspirator, Siforov, who remains at large[1] and he has submitted documents to this Court telling me that he has a legal team in Israel, he has spiritual and religious supporters in Israel and **I have no doubt that given his nature and if given the opportunity, he is a flight risk**.

*Id*. at 264-65; Tr. 704:16 – 705:13 (emphasis added).

---

[1] Siforov remains at large to this day.

The Court reiterated these findings on the record, with additional detail:

> In the previous presentation, I made a finding of fact that Mr. Weinstein is a flight risk. I'm going to amplify that decision because I not only believe that he's a flight risk, but I'm concerned about the nature of his flight risk.
>
> The fact of the matter is we have something like $200 million that has gone missing. Now, some of it we know went to pay tuitions and some of it bought cars and some of it did other stuff, some of it went back to victims in order to lull them into a false sense of security, but however it shakes out, I would say conservatively . . . based on what I recall, being generous in the amount of money that was identified in outgoing flow charts, I think I'm conservative in saying there's $150 million that's gone missing. . . .
>
> The problem with that is there has not been an accounting of five cents, Mr. Weinstein, even though you agreed in the first case to make a full accounting and to demonstrate where the money went. So there's $150 million that's missing, conservatively, could be more, we have no idea where it is, but we do know that you continue to have co-conspirators who are at large. . . .
>
> We also know that your supporters, obviously, have access to resources. They have access to resources because even though you lied about your assets, you continue to retain counsel . . . there's obviously access to resources. . . .
>
> So the fact that you are a flight risk to me, and I firmly believe, by the way, given the opportunity . . . your supporters and you would seek to flee the jurisdiction, I have no doubt about that, particularly because of the way things have been handled while you have been in custody, I believe that there would be a security risk here to be observed.

Weinstein II ECF No. 93 at 4-5; Tr. 30:5-31:22. During that hearing, Judge Pisano summed up the Defendant: "your very core nature compels you to lie and cheat and steal." *Id.* at 5; Tr. 31:14-15.

On September 3, 2014, the Defendant pled guilty in Weinstein II to conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, committing wire fraud while on pretrial release, in violation of 18 U.S.C. §§ 1343 and 3147, and engaging in monetary transactions from specified unlawful activity, in violation of 18 U.S.C. § 1957. On December 15, 2014, Judge Pisano sentenced the Defendant to

a 135-month prison term, 24 months of which was to run consecutive to the 22-year sentence the court had imposed in Weinstein I, and an additional term of three years of supervised release. At Weinstein's second sentencing hearing, the Court described the Defendant's utter inability to be trusted: "What we have is simply a person who is fraudulent in his very essence. That's all he is, he is a fraud. He doesn't know anything else. Everything he tells people is fraudulent, it's a lie, it's bogus. . ." Weinstein Appeal Joint Appx at 648; Tr. 22:17-25.

On September 2 and 25, 2015, U.S. District Judge Anne E. Thompson entered amended judgments ordering the Defendant to pay $224,230,049 in restitution to the Weinstein I victims, and $6,176,750 in restitution to the Weinstein II victims.

On Jan. 19, 2021, after the Defendant had served less than eight years of his sentence, he received a benefit very few in our justice system receive: the President of the United States at that time commuted the Defendant's term to time served, leaving intact the rest of his sentence. Upon his release, the Defendant began serving his term of supervised release under the supervision of the United States Probation Office.

### B. The Instant Offenses

Soon after being released from prison, and while on supervised release, Weinstein began orchestrating a new scheme to solicit money from investors through a company called Optimus Investments Inc. ("Optimus"). Using the alias "Mike Konig," Weinstein ran Optimus with co-defendants Aryeh Bromberg and Joel Wittels. They kept Weinstein's true name and identity hidden because, as Weinstein acknowledged in a secretly recorded conversation, investors wouldn't give them "a penny" if they learned of Weinstein's involvement. Weinstein, Bromberg, and Wittels received the bulk of investor money through a second company, Tryon Management Group LLC, which was owned and controlled by Richard Curry and Christopher Anderson. Tryon promised these individual investors – consisting mostly of friends and family – lucrative opportunities to invest in deals involving COVID-19 masks, scarce baby formula, and first-aid kits supposedly bound for wartime Ukraine. Posing as Mike Konig, Weinstein provided the information for these supposed deals. Based on that information, investors gave money to Tryon, believing the deals were legitimate and not knowing about Weinstein's involvement. In turn, Tryon transferred those funds to Weinstein, through Optimus or other means as directed by Weinstein.

In February 2022, almost immediately after Tryon and Optimus started receiving investor money, Tryon was unable to pay its investors. Rather than reveal this information to investors, Weinstein, Bromberg, and Wittels agreed with Curry and Anderson to pool money from existing investors of both Optimus and Tryon and use it to make monthly payments to other investors in a Ponzi-like fashion. Bromberg, Wittels, Anderson, and Curry concealed this arrangement from

4

investors by falsely telling investors that the payments derived from legitimate investment returns, not other investors' money.

In late August 2022, Weinstein revealed his true identity to Curry and Anderson, admitting in a secretly recorded meeting, "I am Eli Weinstein." In another recorded August 2022 meeting, Weinstein admitted to misappropriating Tryon investor money and making various false statements about the purported Optimus deals. Weinstein acknowledged that he was conducting a Ponzi scheme, stating, "I finagled, and Ponzied, and lied to people to cover us."

Once Anderson and Curry learned that Mike Konig was actually Weinstein, they agreed with the defendants to continue concealing Weinstein's identity from investors and to raise additional money to pay off existing Tryon investors, all in an effort to stop the Ponzi scheme from falling apart and to cover up the fraud.

In addition to defrauding investors, the defendants also conspired to obstruct justice. They helped hide Weinstein's assets that should have been used to pay over $200 million in restitution that he still owes his previous victims. The defendants also concealed Weinstein's myriad business activities, which he was required to disclose to the Court and which were expressly prohibited by the terms of his supervised release. In multiple secretly recorded conversations, Weinstein discussed his intent to conceal his various assets from the Government. In one such conversation, Weinstein referenced hidden assets that he "can't touch" while on supervised release because he'd otherwise "go to jail." Weinstein then boasted, "I just told you something that no one in the world knows because I hid money. Get it?"

On August 30, 2023, Curry and Anderson pled guilty to engaging in a conspiracy to commit securities fraud, contrary to 15 U.S.C. §§ 78j(b) and 78ff, and 17 C.F.R. § 240.10b5, in violation of 18, U.S.C. § 371. Specifically, Curry and Anderson admitted to conspiring with Weinstein and others to defraud investors and potential investors in Tryon and Optimus.

## II.     Legal Standard

Pretrial release and detention are governed by the Bail Reform Act of 1984, codified in 18 U.S.C. §§ 3141–56. Section 3142(f)(2) provides that the Government may seek to detain a defendant pending trial in situations where, as here, there is a "serious risk that [the defendant] will flee" or "a serious risk that [the defendant] will obstruct or attempt to obstruct justice." The Third Circuit has found that the Bail Reform Act authorizes detention where a preponderance of the evidence establishes that there is a likelihood of flight or a threatened obstruction of justice. *United States v. Himler*, 797 F.2d 156, 160 (3d. Cir. 1986).

Section 3142(c), which governs the release on conditions of a defendant pending trial, directs this Court to release a defendant "subject to the least restrictive . . . condition or combination of conditions" that the Court "determines will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(c)(B).

Section 3142(g), in turn, provides several factors that this Court must consider in making that determination, including the "nature and circumstances of the offense charged," "the weight of the evidence against the person," "the history and characteristics" of the defendant,[2] and the "nature and seriousness of the danger to any person or the community that would be posed by the person's release." *Id.* All of these factors weigh strongly against the Defendant's release.

Nature and Circumstances of the Offense Charged

Judge Pisano's description of the Defendant's first scheme aptly describes his conduct in the instant charges: "[i]t is an enormous fraud scheme perpetrated in a calculated way by a defendant over a long period of time to the jeopardy and damage of many, many victims." Weinstein Appeal Joint Appx at 253; Tr. 693:22-24. The conduct here, as described in further detail above, is egregious: Weinstein orchestrated an approximately $35 million-dollar Ponzi scheme while defrauding over 150 investors. Weinstein took advantage of a pandemic by convincing his co-conspirators to help him raise money for purported deals involving COVID-19 masks and scarce baby formula. Weinstein even leveraged war-torn Ukraine by having his co-conspirators solicit money for first aid kits supposedly to be distributed to the people of Ukraine. All of these deals were fake. Yet Weinstein and his conspirators took in over 35 million dollars in investor money to fund these and other fraudulent deals. He did all of this by operating in the shadows: using an alias when conducting business, moving money into accounts held in his co-conspirators' names, and lying to his co-conspirators and to investors.

Weinstein not only committed this egregious fraud, but at the same time, he and his co-conspirators agreed to obstruct justice by hiding Weinstein's assets that

---

[2] The history and characteristics of the defendant, include:

> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law.

18 U.S.C. § 3142(g)(3).

should have been used to pay back the victims of his first two schemes—assets that yet again Weinstein put in the names of nominees and did not disclose to Probation. Not only do Weinstein's actions demonstrate his repeated attempts to thwart supervision and undermine orders of the District Court, but his history and ability to hide funds means that neither the Government nor the Court has any real understanding of how much money to which he and his supporters have access, or where it is. There are millions upon millions of dollars that are entirely unaccounted for, which could easily be used to flee and support a lavish lifestyle elsewhere—all at the expense of his many victims.

In addition, the penalties for the instant offense are substantial, and even higher than Weinstein has faced before. While Probation will not make a formal determination as to his Guidelines exposure until the time of sentencing, the Government's preliminary calculation of the offense level and the Defendant's Criminal History Category results in a Guidelines range of 360 months to life in prison, which provides an extremely compelling motive to flee.

Weight of the Evidence

The evidence in this case is overwhelming. As outlined in the 70-paragraph complaint, the allegations here are extensively supported by messages and audio recordings in which the co-conspirators openly discuss their fraud and obstructionist conduct. On these recordings, Weinstein himself admits to having "finagled" and "Ponzied" during the scheme, and makes crystal clear that no investors would have given the co-conspirators "a penny" if they knew Weinstein was involved. Weinstein even admits to hiding his assets from the Government on these recordings, stating: "I just told you something that no one in the world knows because I hid money. Get it?"

Further, two co-conspirators, Anderson and Curry, have already admitted their guilt in connection with these schemes. Anderson and Curry testified at their Rule 11 hearings, under oath, that:

- When Weinstein's purported deals were not generating the returns he and others had promised to investors, Anderson and Curry agreed with Weinstein and others to pool the money from Tryon and Optimus investors to use to make distributions to other investors in a Ponzi-like fashion. Anderson Tr. 17:20-18:12; Curry Tr. 17:12-24.

- During a series of meetings in August 2022, Weinstein admitted to making various false statements about purported Optimus deals and to misappropriating investor money. Anderson Tr. 18:19-22; Curry Tr. 18:12-16.

7

- Anderson and Curry agreed with Weinstein and others that co-defendant Shlomo Erez would provide a list of assets he nominally controlled for Weinstein so Anderson could use those assets to reassure investors and prevent them for asking for their money back. Anderson Tr. 19:16-20; Curry Tr. 19:9-14.

History and Characteristics of the Defendant

The Defendant's history speaks for itself: he has spent nearly two decades lying, deceiving, stealing, and obstructing. As Judge Pisano predicted, "the history and characteristics" of this defendant have remained unchanged.

Even after being charged with a $200 million fraud case in 2011, the Defendant seized upon his first chance—pretrial release—to engage in a new scheme, victimizing additional people for millions of dollars more. And after being given the chance of a lifetime, a presidential commutation, the Defendant wasted no time in yet again devising ways to prey upon unsuspecting investors. Just months after his release from prison, Weinstein began engaging in yet another fraud while operating under an alias, again stealing millions of dollars from investors while lining his own pockets.

What is worse—and particularly telling about this Defendant's inability to be supervised—he committed these crimes while being supervised by an arm of *this* Court, the United States Probation Office. Following his commutation, Weinstein signed a modification to his conditions of release, acknowledging that he understood them. Yet, despite very clear conditions that prohibited him from engaging in any type of business dealings, including those involving investors, Weinstein did just that. And despite a clear requirement that he disclose his assets to Probation, he has lied at every turn.

Weinstein has proven himself simply unable to be supervised. Despite multiple chances—on bail during Weinstein I and after his commutation—Weinstein has shown again and again that he is not able to comply with the laws of our society or the orders of this Court.

Foreign Ties

Notably and alarmingly, although he argues in his bail motion that "[a]ll of Eli Weinstein's family, friends, and connections are here. He has nothing and no one anywhere else in the world", Weinstein reported to Pretrial Services, and his wife confirmed, that he has family in Israel. In fact, he has close family and friends in Israel. As recently as December 2022, Weinstein petitioned the Court for permission to travel to Israel to visit family—family that he coincidently now disclaims. Weinstein II, ECF No. 98. As Judge Pisano detailed in determining that Weinstein was a flight risk, "I firmly believe . . . given the opportunity, your

supporters and you would seek to flee the jurisdiction, I have no doubt about that . . ." Weinstein II ECF No. 93 at 4-5; Tr. 30:5-31:22.

And far from his characterization that his travel to Israel was "like many Jews…for family vacation" and that "any connection he has to Israel is ephemeral," (ECF No. 53 at 2), he has travelled to Israel **twenty-three times** in the last fifteen years—despite being incarcerated for nearly eight of those years. And concerningly, the Defendant's passport shows only stamps entering the United States, not leaving it. While the Government cannot explain this discrepancy, it is fair to infer that the Defendant has a foreign passport he uses when traveling to Israel.

### III. The Defendant's Proposed Conditions Are Vastly Insufficient

The Defendant proposes a number of conditions, each of which fail both individually and collectively to provide the Court with any assurances.

$10 Million Bond

A court may seek to assure itself that properties pledged as collateral have "moral suasion" over the defendant. *See United States v. Sarivola*, No. 94 CR. 236 (CSH), 1994 WL 613259, at *4 (S.D.N.Y. Nov. 4, 1994) (denying bail where the proposed collateral did "not give rise to strong moral suasion not to flee"). The purpose of "bail is not served unless losing the sum would be a deeply felt hurt to the defendant and his family; the hurt must be so severe that defendant will return for trial rather than flee. This implies that a court must be able to induce a defendant to go to great lengths to raise the funds without violating the condition in § 3142(c) that bail may not be used to deny release altogether." *United States v. LeClercq*, No. 07-80050-CR, 2007 WL 4365601 (S.D. Fla. Dec. 13, 2007) (quoting *United States v. Szott*, 768 F.2d 159, 160 (7th Cir. 1985)); *United States v. Nebbia*, 357 F.2d 303, 304 (2d Cir. 1966) ("It is not the sum of the bail bond that society asks for, but rather the presence of the defendant . . . . If the court lacks confidence in the surety's purpose or ability to secure the appearance of a bailed defendant, it may refuse its approval of a bond even though the financial standing of the bail is beyond question.") (internal citations omitted); *United States v. Fedullo*, 525 F. Supp. 1210, 1215 (D.N.J. 1981) (the source of the funds raised for collateral provides "valuable information regarding the motivation for a defendant to appear") (internal citations omitted).

As an initial matter, Weinstein has provided no information whatsoever about the properties he proposes to post, even the addresses or the names of the family and friends he describes. As a result, Pretrial has no ability to even vet or research those proposed (for instance, the properties could be mortgaged or have liens/incumbrances). But beyond that, foundational to both Weinstein's fraud scheme and obstruction is his ability to move and hide tremendous sums of money well beyond the amount he is proposing as a bond.

9

Judge Pisano made directed comments to Weinstein about how his "supporters, obviously, have access to resources." Weinstein II ECF No. 93 at 5; Tr. 30:5-31:22. At that time, the Court determined that there was at least $150 million that was unaccounted for, and Weinstein has stolen millions and millions more since then. For instance, Weinstein stated during a recorded call that he had "70 million dollars sitting in a bank account", which a co-conspirator confirmed during that recording. Weinstein was also recorded saying to a co-conspirator, "you control 40 million dollars in real estate, you control many millions of investments . . . all under your name or your . . . control." Weinstein then made clear in that conversation that the co-conspirator controlled those assets on Weinstein's behalf and that the assets were "sellable" real estate properties.

The proposed $10 million bond, even if we knew the properties and the individuals involved, is a mere fraction of what Weinstein has stolen and hidden. The bond and the properties lack sufficient suasion to ensure the defendant's appearance at trial.

Moreover, Weinstein tries to paint a picture of a sort of morality that would prevent him from doing anything that would result in his close family members losing their homes. That defies everything that Weinstein has done for the past 20 years— including praying on close friends, family, and members of his community. In the words of Judge Pisano, "[e]verything he tells people is fraudulent, it's a lie, it's bogus. . . he lies to people, even the people who are important to him." Weinstein Appeal Joint Appx at 648; Tr. 22:17-25.

In addition, in this case, he allowed his close friends and associates, including co-defendant Bromberg, to help him perpetrate his fraud without regard to the consequences to them. Bromberg was so close to Weinstein that he assisted in caring for Weinstein's family while Weinstein was in prison, and is virtually family. Although he knowingly and willingly joined the conspiracy, the point remains that Weinstein is more than willing to include those close to him in his crimes. There is no doubt that he remains capable and willing of depriving those closest to him of their valuables, either with or without their participation.

Simply put, there is insufficient evidence that the Defendant— a serial fraudster likely with access to millions upon millions of dollars— cares enough about the proposed properties that the prospect of their forfeiture would be such a "deeply felt hurt," as discussed by the court in *LeClercq*, that it would ensure his appearance at trial.

<u>Home Detention & GPS Monitoring</u>

Weinstein proposes that he be confined to his "family home in New Jersey, where his wife and children live." ECF No. 53 at 4. Weinstein did not provide the address of this residence, so it is unclear whether it may be one of the properties at

issue in the case and potentially subject to forfeiture.  In addition, Weinstein already has a history of failing to reside at his residence on record with Probation.  The Government learned through its investigation that, during the course of the charged conspiracy and while on supervised release, Weinstein was at least periodically staying in Jackson, New Jersey and frequently staying in Florida.  Weinstein did not disclose either of those addresses to Probation.[3]  And further, the Jackson property is specifically mentioned in the Complaint as one of the properties the co-conspirators claimed to investors was "collateral to make sure that we collectively have more than enough to cover the money we have borrowed."

In addition, GPS monitoring does not make a defendant less likely to abscond.  "As courts throughout the Third Circuit have recognized, although electronic monitoring can shorten the time between flight and detection, it provides no assurance against flight at a propitious time or of apprehension once flight is undertaken."  *United States v. Nikparvar-Fard*, 2019 U.S. Dist. LEXIS 117710, at *20-21 (E.D.Pa. July 11, 2019), citing *United States v. Escobar-Lopez*, No. Cr. 92-00102-11, 1992 WL 164718, at *1 (E.D. Pa. July 1, 1992), *United States v. Abdullahu*, 488 F. Supp. 2d 433, 444 (D.N.J. 2007) ("Electronic monitoring and home confinement do not guarantee that defendant will not flee or endanger the community. Electronic monitoring impedes but does not prevent a defendant from fleeing.") (citations omitted), and *United States v. Chagra*, 850 F. Supp. 354, 360 (W.D. Pa. 1994) ("Electronic monitoring and other means of personal supervision are insufficient . . . because they only notify authorities that the defendant is already fleeing.") (citation omitted); *see also United States v. Maxwell*, 510 F. Supp. 3d 165, 173 (S.D.N.Y. 2020) ("As other courts have observed, home detention with electronic monitoring does not prevent flight; at best, it limits a fleeing defendant's head start."), citing *United States v. Zarger*, No 00 CR 773, 2000 WL 1134364, at *1 (E.D.N.Y. Aug. 4, 2000); *United States v. Angwang*, No. 20 MJ 0837, 2020 WL 5947187, at *5 (E.D.N.Y. 2020) (overturning Magistrate Judge's release order, and finding that "[e]lectronic monitoring can alert the authorities to flight, but not prevent it.").

<u>Installation of Doorbell Camera and Cellular Phone Monitoring</u>

Weinstein has already proven time and again that he will ignore and circumvent any attempts to supervise his activities, including specific instances with respect to his cellular phone.  During the charged conspiracy, and while he was on supervised release, Weinstein told a co-conspirator that he had a "Government phone" that he used to communicate with Probation, separate from the phone he was using to conduct his illicit business while on supervised release.  His Probation

---

[3] Judge Pisano specifically ordered that Weinstein must report any change of address to the Court and to the United States Attorney's Office as long as his restitution remained unpaid.  Weinstein Appeal Joint Appx. at 264; Tr. 704: 9-11.

11

Officer confirmed that the number he used to communicate with his co-conspirators was not disclosed to Probation.

Even if there was a way to ensure he does not obtain an additional device, as he has done before, Pretrial cannot possibly monitor his visitors[4] and electronic communications around the clock. *United States v. Epstein*, 425 F. Supp. 3d 306, 325 (S.D.N.Y. 2019) ("The defense bail package proposes excessive involvement of the Court in routine aspects of [the defendant's] proposed home confinement. This is not the Court's function"), citing *United States v. Zarrab*, 2016 WL 3681423, at *10 (S.D.N.Y. June 16, 2016) ("The [bail package] . . . proposed by the defense is not reasonable because, in too many respects, it substitutes judicial oversight and management for (more appropriate) reliance upon trained, experienced, and qualified professionals from the U.S. Bureau of Prisons and the U.S. Marshals Service."). Additionally, Weinstein regularly communicated with his co-conspirators via an encrypted messaging application that does not maintain records of the communications.

<u>Waiver of Extradition from Israel</u>

The Defendant, tacitly acknowledging his strong ties to Israel, proposes that he will sign a waiver of extradition from Israel as part of the conditions of his proposed release. Courts that have reviewed these proposals from defendants have routinely found that they are, at best, legally questionable and do not provide the assurance that defendants purport. *See, e.g.*, *Maxwell*, 510 F. Supp. 3d at 173 (denying bail over defendant's offer to waive extradition from foreign countries because, *inter alia*, "the legal weight of the waivers is, at best, contested"); *Epstein*, 425 F. Supp. 3d at 325 (finding that "[t]he Defense proposal to give advance consent to extradition and waiver of extradition rights is, in the Court's view, an empty gesture" and noting that the Department of Justice's Office of International Affairs is "unaware of anywhere in the world that would consider an anticipatory extradition waiver binding…"); *United States v. Morrison*, No 16 MR 118, 2016 WL 7421924, at *4 (W.D.N.Y. Dec. 23, 2016) (denying bail, and finding that "[a]lthough the defendants have signed a waiver of extradition, such a waiver may not become valid until an extradition request is pending in [another country] and may be subject to withdrawal" and that "the duplicity of the defendants' alleged conduct raises serious questions about the legitimacy of their promises to appear when required."); *United States v. Georgiou*, No. 08-1220-M, 2008 WL 4306750, at *2 (E.D.Pa. Sept. 22, 2008) (denying bail where defendant proposed monetary bond co-signed by multiple individuals and a waiver of extradition, and finding that "[s]hould [defendant] not return, the Government would have to commence extradition proceedings in Canada which may take several years to resolve, and

---

[4] Even if Pretrial could monitor a doorbell camera around the clock, the residence the Government believes Weinstein may be referencing has at least two driveways and several entry points, rendering a doorbell camera useless.

both parties agree that a waiver of extradition may not be enforceable in Canada"); *United States v. Stroh*, No 396 CR 139, 2000 WL 1832956, at *5 (D.Conn. Nov. 3, 2000) ("it appears that there is a substantial legal question as to whether any country to which he fled would enforce any waiver of extradition signed under the circumstances presented in this case. At any event, extradition from Israel (or any other country) would be, at best, a difficult and lengthy process and, at worst, impossible.")

Pretrial Supervision

It hardly bears repeating that Weinstein is incapable of being adequately supervised, a fact he has proved time and again, as described above. In fact, the arm of the Court that would be charged with supervising him should he be released, Pretrial Services, does not believe that there are any conditions or combination of conditions that would ensure his future appearance.

### IV. The Defendant Will Likely Continue to Obstruct Justice

The Third Circuit has clarified that the threat of obstruction is an independent basis for detention under the Bail Reform Act. *United States v. Himler*, 797 F.2d 156, 160 (3d. Cir. 1986) ("it is reasonable to interpret the statute as authorizing detention . . . upon proof of a likelihood of flight, [or] a threatened obstruction of justice . . ."). As set forth in the Complaint, the Defendant is charged with a twenty-month conspiracy to obstruct justice. The conduct underlying those charges—which includes using aliases, concealing his business activities, lying, and hiding assets, in violation of Court orders and the terms of his supervision—is part of a decades-long pattern that the Defendant will certainly continue if released.

### V. Conclusion

This Defendant has spent his life lying to get rich and avoid accountability. He has utilized a web of nominees, shell entities, and aliases to perpetuate his criminal schemes and shield his frauds from Probation and the Court. His unyielding greed and ability to deceive those around him, including Pretrial and Probation, makes him an unquestionable flight risk, and he has shown that he is willing to, and capable of, obstructing justice and threatening the integrity of judicial proceedings. We respectfully request that he remain detained.

Respectfully submitted,

PHILIP R. SELLINGER
United States Attorney

/s/ Carolyn Silane
_____

By:     Emma Spiro
        Jonathan Fayer
        Carolyn Silane
        Assistant U.S. Attorneys

cc:     Henry E. Mazurek, Esq.
        Ilana Haramati, Esq.
        Counsel for Defendant Eliyahu Weinstein (via ECF)